Good morning. May it please the court. Timothy DeLang on behalf of Appellant the Jacksonville Police & Fire Fund. This is an appeal from the dismissal of a securities class action. We submit that the court made four errors below. Primarily the errors were in the application of tell-labs. I think the court has a very thorough opinion and goes through the law and adequately states the law but then we submit misapplies that law and draws inferences against plaintiffs in violation of tell-labs, looks through the allegations and comes up with inferences that don't exist and are not supported by the allegations in the complaint and most importantly doesn't analyze plaintiff's inferences under tell-labs that they are at least as likely as any other competing inference. Certainly tell-labs indicates that you can consider competing inferences but the tie goes to the plaintiff. I submit here even under that standard there's not even a tie, it's not even close. Well can you deal with the individual misrepresentations? I can. That are alleged. I mean it seems to me there are really only three because the alleged, because the 10-Q goes back to December 31st of the prior year so it's the, they're making the same representation. As of this point we didn't have any. In particular focus on the May representation in 2010, the representation that we don't have any information at this point. Your allegation in your complaint was they had already been told at that point and the judge's response to that I think was well that's hearsay. So if we credit your allegations, the COO says I was told that the CEO was going to go to a meeting and tell them that we couldn't pay on time. The CEO comes back the next week and says I went to the meeting and told them we couldn't pay on time and we're still negotiating. So why, as to that one, address what the district court said. That seems to me, the other two I have some difficulty with your C enter arguments but as to that one I think if you credit the allegations in your complaint, their C enter, district court says well that's hearsay. Would you address that? I will address it and the first thing I'll note is we're not at trial. This is not, we don't have to plead admissible evidence. By the way, why is the COO identified by number? Everybody knows who he is, don't they? I'm sure they do. I was wondering if it was like the witness protection program or something darker. It is not the witness protection program. It was, and by the way, it's the COO of not the defendant company, of Garrett, yes, and I'm sure everyone does know who he is and that's part of the law that the Ninth Circuit's developed is that you identify these CWs so that the court can be assured that they were in a position to know the information that they are alleging to provide. But the key point is we're not at trial so this is not admissible evidence. Right, but there is some Ninth Circuit, I agree, there is some Ninth Circuit case law and other case law that says to be plausible hearsay starts to get you, because you don't really know what he said at the meeting, all you know is what he told you he was going to say or said. So deal with that. You're absolutely right and that Ninth Circuit law is dealing with low level employees that say I heard from so and so, from so and so in the hallway that someone said this or someone knew this. This is the COO of Garrett, the largest lender to CVB. There are detailed allegations in the complaint establishing his involvement with a small number of high-ranking individuals at Garrett and the meetings that they had both before and after the meetings with CVB. It's more than plausible based on those details that he provides that are laid out in the complaint that he had this information. He provides those details in a deposition to the SEC? I don't have access to the deposition to the SEC. How do you know he said that? That's my question. Because I talked to him. Because plaintiff's counsel, we interviewed him, we talked to him, he provided this information. So it's not clear from the complaint whether the allegations are derived from some other source or from some... They are not. They are derived from our internal investigation. We're not, you know, as you know under the PSLRA, we're not entitled to access, discovery. Right. We know in talking to some of these witnesses that they have been deposed by the SEC in connection with the investigation. The SEC depositions are not publicly available. That is correct. So let me ask you a separate question here. You need a disclosure in this case to trigger loss causation. Correct. And you're contending the disclosure is, at least in part, the announcement of the SEC investigation and you've got Luce out there. Correct. So, and Luce has got a footnote in it that says, we're not deciding... And I love that footnote, Your Honor. Well, you have to. We're not deciding this issue today. So tell me, we have to decide the issue in your case, tell me why you fit within the Luce footnote or what we should interpret of the Luce footnote. I'd be happy to and it's interesting, the lower court didn't have the benefit of Luce at the time the opinion were... And all Luce says is we're just not treating this issue. Correct. And what Luce says is the announcement of an investigation standing on its own with nothing more is insufficient. And then they analyze that. An investigation doesn't tell you anything more than that there's an investigation. So the footnote says you need more. And we submit here there is the more. The more is the September 9th announcement? The more is both the internet posts that were hinting at the problem and those preceded the announcement of the SEC investigation. So there were posts and internet posts from an anonymous blogger questioning CVB's practices. By themselves that wouldn't be sufficient. No, no, absolutely. I don't submit that and I don't make that argument. So the important thing is the eventual announcement by CVB that we're writing down some of the Garrett debt. A hundred percent, but you take the entire story together to get the more that the court was looking for in Luce. And in Luce, in particular, the court said the more could be a later announcement of wrongdoing. But in Luce they didn't allege the later announcement or the stock drop. So my question is if we adopt the Luce exception, if you will, how do we measure damages? I mean, here what happens is the stock goes down 20 percent in response to the SEC. How do we do loss causation? The SEC goes down 20 percent in response to the SEC announcement. When CVB finally gets around to saying we're going to write down the Garrett loans, truth is nothing happens to the stock. It goes down a couple pennies and comes right back up. How do we know what caused the loss here? How can we do a loss proximate causation analysis? Ultimately that will be done by experts, but I would submit in terms of what drops are permitted, that the drop and the investor's reaction to the announcement of the SEC subpoena immediately followed by analyst reports. We know. Did you see these other reports that were out there? The company kept saying no, no, no. Here's the investigation. It's looking at these exact same issues. And less than a month later they come out and admit yes, everything Garrett has is worthless. And they entered into forbearance agreements with Garrett sometime in August. We don't know when, but we do know certainly by the first week in September that they admit that they have these forbearance agreements. So when did they enter into those agreements as opposed to when they actually announced it to the market? But this all centers on their relationship with Garrett and their practices with Garrett. And that's what the market knew and understood. The announcement of the investigation with the preceding information that was out there, the analyst reports that immediately identified Garrett as the issue, and then the admission a month later. Yes, the stock moved six cents, but it also moved six cents down on a day when the entire index was up. And it moved right back up to its prior price within several days. It did, but the market's going up as well. And that takes some expert analysis to determine its impact in relation to the market and in relation to its peer index group. Could you? I'm sorry. Judge Callahan, please. Well, on the Sienter issue, there are things that come out later that are fairly damning on the charge-offs and all of that. So, but then are you able to use that to say the earlier one, that the earlier statements were false? I mean, are you able to use all of the statements that are negative later to bolster the earlier, to attack the earlier? I think the best direct answer to your question is we are not pleading fraud by hindsight. We are not looking at information that came out in the market in relation to the corrective disclosures and trying to say they knew that sooner. We have specific facts of information that they knew as early as September 2008. We also, and this is where I think the district court erred. Are you allowed to? I mean, are you allowed to do it by hindsight? I'm sorry. I'll let you finish. Well, can you do it by hindsight in the sense because it does seem to be when they knew, you know, when they knew certain things? It adds to the entire picture. And that's what the courts after Tell Labs have instructed is that you have to view the complaint holistically and you have to view all the allegations together to make a determination as to whether or not there are sufficient allegations and it's plausible and sufficiently particular. I'm sorry. I didn't mean to cut you off. When you go back to the prior two representations, certainly at the end of 2009, it appears that Garrett had been current in its payments for over a year. That's not correct. Well, that's, tell me where in the record it's not correct. It looks like Garrett had been current on paying all of its loans since the refinancing, since the refinancing the year before. Am I wrong in that? You are. And if you look at the information from CW9, the COO of Garrett, he indicates that at the time they went in early January, they had been behind. Right, in January. They were 30 to 60 days behind at that point in time. When the representation was made at the end of the year, are you saying that there's evidence in the record that when the, I mean, it ought to be fairly easy to figure this out. At the end of 2009, when the representations are effective, is there any indication in the record that Garrett was delinquent on any loan at that time? I can tell you that three days before the end of that quarter, December 2009, they gave a $38 million refinancing to Garrett. Right. And that's alleged in the complaint. Right. But I'm not sure the refinancing makes it plausible that they knew Garrett couldn't repay it, was a bad borrower. I'm going to disclose my cards on this. I find the May one your strongest allegation. But as to the other two, when we instruct the judge to look for plausibility and you've got somebody who's current, I think, on its obligations at one point, and another point goes in and says let's restructure them, I'm not sure that either of those give rise to scienter. So tell me why they should. They do because they're representing that these loans are performing as agreed. They're misrepresenting to the market what these loans are. They're giving them refinancing. What's the statement? The statement is we don't have doubts about the ability of people to repay the amounts loaned. In part. It's not they're performing as agreed. We don't have any doubts about their ability to repay. They do have a statement. Defendant Myers says the Garrett loans are performing as agreed. That's in the meeting with the… Correct. So you're focusing on the financial statements and that we don't have any knowledge. Okay. I understand now where you are on that particular statement in the financials in the 10-K. The other thing I would submit is they make that representation as of December 2009. But when did they sign that 10-K? They didn't sign that 10-K in December 2009. Right? They signed that 10-K in 2010. But an investor surely wouldn't look at that and say they signed it later so it must be accurate as to a later date. They have an obligation to fully disclose information known to them. They can't wait and say, well, we didn't know it then. We know it now. As I'm signing this 10-K, I had a meeting with Garrett. They told me they can't perform. I know that no other lender in the market is giving them money. I know every other lender is foreclosing on them. I know they've lost 85 percent of their equity. But I'm going to trick the market because as of 2009 they hadn't told me that yet so I'm going to sign this document. That's misleading under the securities laws. You cannot do that. Is it misleading that gives rise to a private cause of action for the statement? 100 percent. They are representing that they're not aware of any loans that have the credit problems of the borrower puts at risk those loans. And when they sign that document in that 10-K, they absolutely did face it. Even if they say as of that date. I mean, they have to file a new 10-K, a new 10-Q within a month or so. Correct. Even if they do it as of that date. They're signing it as of the date they signed that 10-K. You can't. They're trying to. It's essentially, I think it's quintessential securities fraud. They have material information at the time they signed that 10-K and they're trying to play a game by saying, well, we didn't know then. Certainly we know now, but they didn't tell the market that. Now, do your allegations they knew on January 10th or so? It's early January 2010 is the allegations of when that meeting occurred. Now, I want to be clear. Does it make a real difference? In other words, we're talking about the difference between December 31st and January 10th, aren't we? Certainly. Exactly. Right. And I just want to make clear, and I understand you're focused on the January 10th. We have allegations in the complaint that they knew throughout the class period that Garrett was financially distressed. I guess would it be plausible if you're making the argument, okay, they absolutely knew when they signed it, and they're trying to be, what is it, cute by half or whatever to parse with the dates. So, I mean, would it be plausible if they knew the 10th that they could have known before and that they were just using very careful words to avoid? I submit absolutely yes, and I think the complaint supports that, that they knew even before that date. But you do agree that the judge needs to, under our case law, sort of crazy what the Supreme Court makes us do, parse the complaint not only for the sufficiency of its allegations facially, but to determine whether they're plausible, whether you've alleged enough facts to make it plausible that they had C enter. I agree with that standard, and I'll point out that under Tell Labs and Ninth Circuit precedent, you look at them individually, and then you look at the complaint as a whole holistically. And I think the court erred in not looking at the entirety of the complaint and just focusing on a few allegations and the hearsay of the COO. Thank you. Thank you. Thank you, and may it please the court. I'll start with loss causation. Loose completely ends the case. No, it doesn't. It's got a footnote that says we're not addressing your case. No, because what it says, it has a footnote that says that we're not going to deal with cases where there was a subsequent finding of fraud. No, it says a subsequent disclosure, really. Subsequent disclosure is wrong. And so your disclosure later is not – let me just finish. Okay. Then you can tell me where I'm wrong. Your disclosure later is notwithstanding the representation we made in our filing, we're writing down this, we're writing down this. There was no inconsistency is the answer. We wrote down that loan, those loans in September because of what happened at that time. We designated them non-performing at that time. That doesn't mean that they were non-performing at some prior time. Okay, but now we know that the COO tells them something, and it's alleged in the complaint that your client was expressly told in January that Garrett couldn't perform on these loans. But Garrett – well, no, but the problem is they did perform, and we were told other things as alleged by CW9 about why they could perform. They could perform because they were going to potentially get new equity. They were going to sell assets. They had $150 million in equity to take from. We also had – because when we gave them the $10 million in 2008 or 2009, whenever it was, we had excess – we had liens on the excess cash flows. We had a lot of reasons to believe that they were going to hit. And I take that as true for purposes of your argument through the beginning of January 2009, but there's an allegation that the CEO came to your client and said we cannot pay the loans. And it's – and they also – You agree at the – if they had an affidavit from the CEO that said that, wouldn't that give you some knowledge? Well, they don't have an affidavit from the CEO. Okay, so the question is are their allegations sufficient? It's double hearsay, which this Court has consistently said doesn't count for purposes of this analysis. But isn't it plausible? What? The COO says I went to a meeting and the CEO told me what he was going to do. Then two weeks later he came back and we had – he had a meeting scheduled. We're talking about January 2010. Yeah, January 2010. He had a meeting scheduled with CVB. And then sometime soon thereafter he came back and said I went to the meeting and I told them this. Why isn't that – why isn't that plausible? Another reason – well, it's not just a question of plausible. They have to show that they have a cogent and compelling inference of Center, Scienter, and that it's the most compelling inference. But it's – because there are a lot of other reasons in the – based upon the facts of the complaint to show why we had a reason to believe they would pay. For example, they did continue to pay on the loans, which is reflected actually in the allegations of the complaint itself, which say that the loan principal balance was $85 million before the class period, that it was $84 million during the class period, as reflected in the McAree Analyst Report, which I'd like to get to in a minute. And at the end it was $82 million. So it kept going down, down, down. And they don't have any specific – they don't have any specific allegations about what didn't pay. They just have this allegation about the January – the hearsay allegation about January 2010. But where is the data about – where are the facts about what loans didn't pay and how much they were behind during the class period? There is none. They have – they make these allegations about, you know, to invoke the core inference, the core operations inference about meetings and memos and the loan committee. No, no information about what – how much they didn't pay. None. And to go back – I mean, I'm going to go back to law school. Let me go back for a second. Let me ask you the question I asked you before. If it is plausible that the COO told them this in January of 2010, don't we have a – No, because they also – because if we accept the plausibility of what CW9's hearsay assertions are, he also said we're working to get equity. We're working to sell off assets. What was the representation in the May filing? What was the wording? Well, the May filing was – it talked about – I have to search. It said we have no serious doubts or something like that. And this is important. Oops. Sorry. I can find it too. Yeah, yeah. And I'm glad you're asking this because it's important to have the exact language. We are not aware of any other loans as of September 30, 2009, for which known credit problems of the borrower would cause serious doubts as to the ability of such – serious doubts as to the ability of such borrowers to comply with their loan repayment terms or any known events that would result in the loan being designated as non-performing at some future date. So what happened between the date of that representation and your write-off? Because at some point they couldn't pay and they didn't pay. But here's the reason why. Sometime between May and September. To go back to the holistic Sienta analysis, there's a couple of things that are missing. What we actually told the market other than this, which cuts against Sienta. Here's what we told the market. They rely on this Macquarie Analyst Report for the quotation that they snip out of it that said that the Garrett Group credit is performing as expected. Stop. They hit the stop. But here's what the rest of the sentence says. But remains on classified status paren substandard. Well, we also have at SER 248 the definition of substandard, which is adopted by the controller of the currency, the FDIC, and so on and so forth. A substandard asset is inadequately protected by the current sound worth and paying capacity of the obligor of the collateral pledge or the collateral pledge of any. Assets so classified must have a well-defined weakness or weaknesses that jeopardize the liquidation of the debt. They are characterized by the distinct possibility that the institution will sustain some loss if the deficiencies are not corrected. Let's assume that we don't put any weight on the analyst reports along the way. But the point is they plead this analyst report. We said this to the market. That's inconsistent with Sienta. If we were trying to deceive the market and think that these loans were never going to have any problems, why would we have said that? It completely refutes Sienta. And not only that. But that's a factual refutation. That doesn't mean that they haven't plausibly alleged Sienta. But it's plausibly alleging is not the test. Yeah, but these problems, then, if you look at everything that happened, I mean, could they have really — I mean, they didn't just happen overnight. They don't just happen overnight, but we're not required to take the most pessimistic view on this one particular loan until we really make a conclusion. And that's a judgment call. And the question is, was there Sienta? Did we intentionally deceive the market about this 2.5 percent of our loan portfolio? And, again, to go back to this analyst report that they quote out of context, write three sentences before what they quote. Management confirmed that NPAs, that's non-performing assets, and NCOs, net charge-offs, have not yet peaked and are likely to experience mounting pressure, particularly CRE. That's commercial real estate. And reserve additions will likely persist. That's inconsistent with somebody trying to deceive, and this is with respect to 100 percent of our loan portfolio, not the 2.5 percent that somehow became the focus of this case. That shows that the fact that we would say this to analysts shows that there was no Sienta. And not only that, there is the disclosures that we have in our 10-Ks and 10-Qs about continuing deterioration in the real estate market that's affecting our largest borrowing relationships, that may cause our largest borrowers not to be able to pay. And there might be charge-offs, and there might be write-downs. But then you make a separate representation that we only have serious doubts about the following borrowers. You have a list, right? No, no, just let me finish. We'll give you time. You make a representation that we have serious doubts, but we don't have serious doubts except as to the following list, right? Right, serious doubts. Okay. And you also have a representation that the real estate market is bad. Right. And it's going down. Everyone knew. So that means that despite the fact that the real estate market is bad, you don't have any serious doubts about Garrett, correct? Right. We don't have serious doubts because we knew that they had money. What I'm saying is that other representation to me cuts the other way. We know that the real estate market is bad, but nonetheless we don't have any serious doubts about Garrett. Why would we lie about that when we're telling the truth? I don't know why people lie. This is telepathy. It may be negligent. You may be right. There may be no cienter. That's exactly right. That's the point. We're at a pleading stage in this case. And the pleading stage, this isn't Rule 8A. This is the PSL. This is not just 9B. It's the PSLRA where the Congress, if you look at the legislative history, Judge Callahan, talked about fraud by hindsight and how fraud by hindsight, this is in the legislative history, was something that we want to get rid of. And this is a perfect example of fraud by hindsight because what they're saying is just because they're saying that essentially because we wrote this off in September of 2010, we should have done it sooner. That's the classic story in securities litigation that Congress meant to stamp out. And at the end of the day, where are the internal reports? Where is the information that shows that we actually made the conclusion that there were serious doubts? Was a discovery conducted on that issue? Excuse me? Was a discovery conducted? On this? Yes. No, but there isn't. But, again, that's another point. So how are they supposed to get the internal reports? They're not supposed to because that's the point of the PSLRA. You have to get it first before you can bring a suit. That's what Congress enacted. Here they have, and I just need you to return to this. Here they have, if we discount it as hearsay, then you're right. But if we don't discount it as hearsay, here they have an allegation supported by the COO of the company that your client was told in January that they couldn't pay the loans. I'll leave a part that it's double hearsay. Okay. I'm going to set that apart. I can work on the same terms, Judge Hurwitz. There's the NVIDIA case, the NVIDIA case which came down not too long ago. There, the allegation was that HP had told NVIDIA, hey, your chips are bad and you're going to have to pay up for joints of the contract because the chips you gave us were bad. And this court held that didn't suffice because that didn't tell, that doesn't tell us whether NVIDIA actually believed it was going to be liable to HP for the chips. That's one. Two, gompers against Vizics. That was a case where, very similarly, there was an allegation of what the company, Vizics, was told by someone else. And the court said, well, that's not enough. There has to be something about what they believed. Because just because they told us that they were considering bankruptcy, that's essentially the allegation. Well, okay, they didn't. They didn't go into bankruptcy for how many more months. Obviously, they're saying, oh, we're dire. You're going to give us a break. We're going to do, they ought to do that. But they also told us, they also told us that they were looking to fix the problem, that they were going to sell assets. They were going to look for equity. And they had $150 million still in equity. They had skin in the game. So it's perfectly reasonable for us to have concluded that, well, we don't have serious doubts yet. We may, but these are substandard loans. And, you know, they do have, you know, there's a distinct possibility. So that's the distinction. This is what this fraud case, alleged fraud case, is about, is whether or not. Can I take you to the loose footnote? The loose footnote, yes. It's not L-O-O-S-E for those in the audience. I have loose ends, Your Honor. With respect to the loose footnote, I understand all your arguments about why your subsequent disclosure isn't an admission of wrongdoing. Right. But let's forget that for a second. Tell me what the loose footnote means. What do we need? Here's what they meant. Okay? SEC announces an investigation like they did here. Right. And again, you know, there's a loss for that. And, of course, the defendants would then have the argument, oh, well, gee, that wasn't a disclosure of fraud. And then a year later, the SEC charges them and there's a consent decree and whatnot, or there's a court case and they're guilty. Okay? Or something. Okay? That didn't happen here. What if you're quiet? No. The SEC never came back. Our public, you know, we could take judicial notice of the fact they've never suggested the SEC ever came back. And, in fact, in our last 10-Ks and 10-Qs of disclosure, we haven't heard from the SEC since 2011. I'm trying to figure out what we need under the loose footnote analysis. You need something that actually indicates that there was, that not just, not simply that, oh, you took a write-down on something that somebody says you should have written down earlier, but you have to have some kind of evidence that you should have taken the write-down earlier. And, indeed, because this court in Apollo held that Rule 9B now applies to loss causation, it's essentially similar to the, it's similar to the, to the tell-lapse analysis. And they don't have that here. The two things they argue are, first of all, this blogger. Okay? The blogger, they even use the word speculative and speculation to refer to what the blogger did. And, in fact, they don't endorse the crazy allegations that the blogger made. Forget about the blogger. The blogger. I'm trying to figure out what kind of announcement from your client would What kind of statement from your, I know you're arguing, stop. Let's talk in the same way. Okay. I don't know, I know you're excited. What, I know your argument that the statement your client made doesn't qualify as one. I'm trying to figure out what kind, in your view, what kind of announcement. I'll give you an example. A restatement. Okay? In fact, in Luce, there was a restatement. Right? It's worse than the situation here. Here, we simply said, we're writing this down. We didn't say, ooh, we're writing this down because we should have written it down a year ago. And so we're restating our accounts for the last year. Okay? And in Luce, they held that that restatement didn't count because there was no stock drop associated with it. Right. There was no causation from it. Okay? But here, we don't even have that. That's the situation. That's a restatement, an SEC charge, something that actually indicates fraud after the stock drop that doesn't really count. Okay? And they don't have that here. Not only that, that stock drop, you know, the stock drop that they allege in September. Again, you had the point, Judge Hurwitz. The stock went down six cents. And then it went up eight cents the next Monday. And that doesn't suffice. Of course, their argument is that the market had already absorbed all the information from. Yeah. You know why? Well, actually, another reason why the stock, there was basically no stock drop, was another reason why there isn't cyanide. We took a reserve. We wrote down $34 million of the $82 million, which had been paid down from $85, as I mentioned before. We wrote off $34 million in September. And you know what the charge against earnings we took at that time? It was only $9 million because we took reserves. And we told the market about those reserves, which, again, is another point in the holistic analysis on Ciander, demonstrating why it is that there was no Ciander. Can I just ask one more question? Yes. I think you can answer this yes or no. I think your opponent answered this. The trial judge didn't have the benefit of loose at the time, right? Right. So he didn't know that we would say SEC investigations don't count. Right. And he didn't know that we would say, well, maybe they do. Judge Morrow. Yeah, Judge Morrow, I'm sorry. And didn't know that maybe there was an exception to that. Should we send it back to the trial judge? No, because basically she applied the very rule. In fact, I think she might have even cited the district court decision in loose. And basically, loose directly follows on from Corinthian Colleges, where basically this court said, look, if you're disclosing the risk of something, that's not sufficient to constitute the something. And here, it's exactly the same situation. She applied the correct standard. She presaged loose. And there's no reason for a remand. The market's closed. Thank you, Your Honor. Thank you, Your Honor.
judges: Pregerson, Callahan, Hurwitz